In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3765

Quantum Management Group, Ltd.,

Plaintiff-Appellant,

v.

The University of Chicago Hospitals,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 2248--Ronald A. Guzman, Judge.

Argued March 1, 2002--Decided March 25, 2002

Before Flaum, Chief Judge, and Bauer and
Harlington Wood, Jr., Circuit Judges.

Flaum, Chief Judge.  Magistrate Judge
Ashman granted The University of Chicago
Hospitals' ("UCH") motion for summary
judgment, holding that Quantum Management
Group, Ltd. ("Quantum") was not entitled
to additional payments under the contract
between the parties because Quantum
failed to present a genuine issue of
material fact on an essential element of
its case. The court held that at least
two of the three conditions precedent
were not met. The court also found that
UCH was entitled to damages from Quantum
for breaching the contract. Quantum
appeals. We affirm the decision of the
district court.

I.  Background

   In 1995, in an attempt to reap the
savings that the private sector had
achieved through managed health care
programs and to improve beneficiaries'
access to care, the State of Illinois
announced an intended program that would
require Medicaid recipients to be
enrolled in managed health care plans.
Because the state's announced program had
the potential of threatening its patient
base, UCH decided to create its own
managed care plan for its Medicaid
patients.

A.  Facts Relating to Quantum's Claim

   In order to create this type of plan, Illinois law required UCH to enter into a contract with the state ("the State Contract") that authorized the proposed plan to provide assistance to Medicaid beneficiaries, and provided that the state would pay the plan a monthly fee for each enrollee.

   In July 1996, UCH entered into a contract ("the Agreement") with Quantum, a consultancy with experience in establishing and operating managed care programs. Frederick Fey, as trustee of the Frederick Fey Family Trust, was the president, sole limited partner, and controlling shareholder of Quantum Management Group, Inc., Quantum's corporate general partner. The Agreement provided that Quantum would design, establish, and operate a managed health care plan ("the Plan"), eventually known as Family First, in which UCH's Medicaid patients could enroll. Upon execution of the Agreement, Quantum hired George Morrow to be CEO, as well as a number of consultants and other employees--150, at the peak--for the plan. The Plan became operational in January 1997; the first members enrolled in March of that year. The Plan's highest enrollment level in any given month was 17,618. Morrow resigned as CEO in July 1997.

   The Agreement included a two-and-a-half page section ("Section IV") entitled "Payments to Quantum." The language of Section IV, and the facts surrounding the provision's conditions, give rise to Quantum's allegations. The provision states first that UCH will pay Quantum monthly consulting fees and expenses. (Section IV (A)). UCH did so--to the tune of 2 million dollars. Section IV also provides for additional payments to Quantum if certain conditions are met.

In addition to the other payments described herein . . . UCH[ ] shall pay Quantum compensation for its services in an amount based on the number of enrollees in the Plan on the first day of the previous month (hereinafter referred to as the "Monthly Fee" payable with respect to such previous month) provided, however, that no Monthly Fee shall be payable with respect to any month in

which the Plan experienced an operating loss. For such purpose an operating loss shall mean an excess of total expenses over total revenues (in each case not including investment income and expenses) computed on an accrual basis as specified by generally accepted accounting principles.

Notwithstanding anything to the contrary above, a Monthly Fee with respect to a given month shall not be due if the total enrollment in the Plan on the first day of the previous month was less than 120% of the breakeven level of enrollment. The breakeven level of enrollment for such purpose shall mean the number of enrollees in the Plan on the first day of the first month in which the Plan did not experience an operating loss, as defined above.

Section IV(B). Under the terms of this Section, Quantum is not entitled to a Monthly Fee for any given month unless at least two profitable months exist. First, the Plan must have achieved a breakeven level of enrollees (or, in other words, achieved the number of enrollees necessary to create an operating gain) during any month before the one for which a fee may be due. Second, the month for which a fee is due must have surpassed that breakeven level by at least twenty percent. UCH never paid Quantum Monthly Fees.

The only financial data produced at trial showed that the Plan suffered an operating loss each month it was in operation. Quantum contends that the plan broke even in either March or May of 1998, as evidenced by Fey's testimony that two officers of UCH told him that the plan was "cash positive" and making money. Quantum points to no evidence suggesting that a month existed where the Plan's enrollment level reached 120% of the supposed breakeven point. Quantum admits that no hard data exist as to whether the Plan ever reached a breakeven point, but contends that it was UCH's duty to keep such records.

Section IV(D) of the Agreement provides that UCH shall continue to pay any Monthly Fees payable under Section IV(B) if it terminates the Agreement without cause. Section IV(E) states that if the Agreement is terminated for cause,

payments due under IV(B) shall cease. Section IV(F), which applies when the Plan undergoes a significant structural change, provides that development fees, which Fey concedes include IV(B) payments, shall be equitably adjusted.

In the fall of 1997, the State announced that, contrary to its 1995 announcement, it would not implement a mandatory managed care program for Medicaid beneficiaries. In May 1998, UCH told Quantum that it intended to sell the Plan and terminated the Agreement. Quantum considered buying the Plan, but was outbid. On July 31, 1998, the sale of the Plan closed. The State Contract was, therefore, terminated as well.

B.  Facts Relating to UCH's Counterclaim

UCH paid Quantum under Section IV(A), which states that UCH shall reimburse Quantum for all expenses, to the extent that such expenses were "within the scope of the Budget included within the Business Plan or within the scope of a later Budget . . . in effect at the time the expense was incurred by Quantum." The Business Plan allowed for $25,000 per month for Fey's services from April through December 1997. A December 17, 1996 modification to the budget allowed for an increase in consulting fees as well as an additional $26,000 per month for Morrow's services. Morrow resigned in July 1997. Quantum continued to charge and accept the $26,000 per month for five months thereafter. That is, it received a total of $130,000 for services it did not provide. Also, as consideration for the December 17 modification, Quantum agreed to split equally the increase in fees; UCH would initially pay Quantum's share, as a draw against future payments. Quantum's share of the increase equaled $148,690. It has not repaid UCH.

Section III(E) of the Agreement provides that Quantum shall recommend and "assist in the selection, development, and/or integration of information and internal communication systems, which shall include a management information system ("MIS") for the gathering, synthesis, storage and retrieval of data required for the plan. . . . [T]he MIS shall be designed for the purpose[ ] of . . . making required reporting to regulatory agencies." Quantum selected an MIS that

failed to make the required reporting to the Illinois Department of Public Aid. Due to this failure, the Plan did not comply with the State Contract. UCH retained another consultant to achieve compliance with the reporting requirements at a cost of $166,945.

Finally, when Fey moved to Chicago to begin working for the Plan, UCH paid a $2,026 security deposit required by the landlord of his apartment. When Fey moved out, he instructed the landlord to refund the deposit to him. He never reimbursed UCH.

Pursuant to U.S.C. sec.636(c) and Fed. R. Civ. P. 73, the parties consented to the exercise of jurisdiction by Magistrate Judge Ashman for the limited purpose of ruling on UCH's summary judgment motion. Judge Ashman granted the motion, holding that Quantum failed to raise a genuine issue of material fact as to whether the Plan achieved an operating gain during any given month, or as to whether the Plan ever reached 120% of the enrollment level of any supposed breakeven month. The court also awarded UCH $447,661.37, holding that Quantum breached the Agreement by collecting fees earmarked for Morrow's services after his resignation, by failing to return its half of the additional consulting fees advanced by UCH, by failing to return the security deposit on Fey's apartment, and by failing to select an appropriate MIS.

II.  Discussion

We review a grant of summary judgment de novo, viewing all of the facts, and drawing all reasonable inferences therefrom, in favor of the nonmoving party. See, e.g., Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706 (7th Cir. 2002). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id.; Fed. R. Civ. P. 56(c). If the nonmoving party fails to make a sufficient showing on an essential element of her case, the moving party is entitled to judgment as a matter of law because "a complete failure of proof concerning an essential element of the

[nonmovant's] case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## A. Quantum's Claim

No breach on UCH's part occurred unless it terminated the Agreement without cause, and two requisite profitable months occurred--one that first achieved an operating gain (the breakeven month), and a second that surpassed the breakeven month by 20%. The district court assumed without deciding that UCH's termination of the contract was without cause. We do the same. At issue, then, are the two Section IV(B) profitable-month conditions. The only financial data presented--UCH's Spreadsheet of Plan Financial Information for Fiscal Year 1998--itemized revenues and expenses for the year and showed an operating loss for each month. According to this evidence, neither a breakeven month nor a month that achieved at least 120% of the enrollment level of a breakeven month occurred. These two profitable months are conditions precedent to UCH's contractual obligation. Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co., 962 F.2d 628, 633 (7th Cir. 1992) ("Under Illinois law, a condition precedent is some act that must be performed or event that must occur before a contract becomes effective or before one party to an existing contract is obligated to perform."). Where a condition precedent is not satisfied, no breach of contract occurs for failure to perform. Id.

## 1. Agreement Section IV(B): Breakeven Month

Quantum contends that Fey's deposition testimony that two UCH representatives told him that the Plan was "cash positive" in March 1998 constitutes sufficient evidence to raise a genuine issue of material fact. We disagree. First, the district court held that such testimony was inadmissible hearsay (as Fey did not establish that the statements were made in a representative capacity) and violated myriad other federal rules of evidence. Moreover, even if we accept the statements as true, they do little to prove that a breakeven month occurred as defined by the Agreement: "an excess of

total expenses over total revenues . . . computed on an accrual basis as specified by generally accepted accounting principles."

Quantum argues that the testimony is enough because the Agreement placed the burden of keeping the monthly breakdown of accrued monthly medical expenses was on UCH. Because UCH breached the contract by failing to do so, it contends, it cannot be expected to provide specific financial data to the court. However, Quantum can point to no actual clause in the Agreement that places such a duty on UCH. Quantum attempts to rely on the Illinois Wrongful Prevention Doctrine which provides that a party that prevents the occurrence of a condition precedent may not ruly on such nonoccurrence to refuse to perform. Swaback v. American Information Technologies Corp., 103 F.3d 535 (7th Cir. 1996). The doctrine is simply inapplicable in this case because nothing suggests that UCH wrongfully pre vented the Plan from achieving an operating gain. Even if Quantum could show that UCH had the duty to produce better records and did not do so, which it cannot, the doctrine would not be of any help.

2.  Agreement Section IV(B): 120% of the Breakeven Level

Even assuming that the evidence to which Quantum points regarding the breakeven month creates a genuine issue of material fact, Quantum presented absolutely no evidence to the district court that a month existed where the Plan achieved 120% of the breakeven level of enrollment. The lowest enrollment for a month that Quantum argues was a breakeven month was 15,825 in March 1998; one hundred twenty percent of 15,825 is 18,990. Quantum does not contest that the Plan's highest enrollment level was 17,618. In fact, it fails to address the issue altogether in its brief on appeal. Quantum admits that the 120% month is an essential element that it must prove, but makes no attempt to do so.

3.  Other Agreement Sections

If the Agreement was terminated for cause, Section IV(E) provides that no payments beyond those paid by UCH are due. If the Agreement was terminated

without cause, Section IV(D) states that any payments called for under IV(B) shall continue. If the sale of the plan constituted a structural change, then Section IV(F) states that any IV(B) payments due shall be equitably adjusted. Because Quantum fails to show that it was entitled to payment under Section IV(B), Sections IV(D) and (F) are not implicated. Therefore, whether the Agreement was terminated for or without cause, Quantum creates no issue of fact. We agree with the district court that summary judgment was appropriate.

B.  UCH's Counterclaim

First, UCH argues, and the district court agreed, that Quantum breached Section IV(A) of the Agreement by continuing to charge and accept $26,000 per month, earmarked in the modified budget for Morrow's services, for five months after Morrow's resignation. Because IV(A) allows for only those expenses within the scope of the budget, and Quantum makes no argument in its brief on appeal contesting that these payments were outside the scope of that budget, we agree with the district court that UCH is entitled to the $130,000 that it paid for services never rendered.

Second, the district court held that Quantum was liable to UCH for $148,690.37 that was advanced by UCH. As consideration for the December 1996 modification to the Plan's budget, allowing for an increase in consulting fees to Quantum, Quantum agreed to share equally the increase. It never repaid UCH its share, and presents no argument on appeal as to how the district court erred in finding it liable. UCH is entitled to payment.

Third, we agree that Quantum is liable to UCH for the $2,026 security deposit. It makes no argument as to why it is not, and creates no genuine issue of material fact.

Finally, the district court held that Quantum is liable for the $166,945 that UCH expended to retain a consultant to bring the Plan into compliance with the reporting requirements of the Illinois Department of Public Health. Section III(E) of the Agreement provides that Quantum shall "make recommendations and

assist in the selection . . . of . . . a management information system ("MIS") . . . . Among other things, the MIS shall be designed for the purpose of . . . making required reporting to regulatory agencies." Quantum has admitted that it was responsible for the selection of MIS software and that the system it chose was unable to meet the state reporting requirements. It did not present evidence to the district court that created an issue of fact and it similarly fails to develop an argument on appeal.

III.  Conclusion

For the reasons stated herein, we AFFIRM the decision of the district court.